AO 91 (Rev. 11/11)   Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT

01/11/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

01/11/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ D.C. _____ DEPUTY

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | 5:22-mj-00012 |
| Maria Elvia Mares | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 29, 2019_____ in the county of _____Riverside_____ in the _____Central_____ District of _____California_____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. 152 (3) | False Statement in Bankruptcy |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

/s/ Pursuant to Fed. R. Crim. P. 4.1
_____
*Complainant's signature*

Jazmin Vidana, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   1/11/2022
_____
*Judge's signature*

City and state:   Riverside, California        Hon. Shashi H. Kewalramani, Magistrate Judge
_____
*Printed name and title*

*AUSA:* Ruben Escalante

## AFFIDAVIT

I, Jazmin Vidana, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since September 2018. I am currently assigned to the Riverside Resident Agency of the Los Angeles Division of the FBI. I am currently assigned to a squad that investigates white collar crime violations. I have a Master of Business Administration from Loyola Marymount University, Los Angeles. I have received 21 weeks (approximately 840 hours) of instruction in the fundamentals of law, ethics, interviewing, report writing, firearms, surveillance, defensive tactics, and case management at the FBI Academy in Quantico, Virginia.

2.   In the course of my employment with the FBI, I have investigated a variety of white-collar violations, including bank fraud, money laundering, bankruptcy fraud, mail and wire fraud, and civil rights violations. I have participated in numerous aspects of criminal investigations, including the interviewing of witnesses, interception of wire communications, physical surveillance, utilization of confidential informants, consensually monitored telephone conversations, the execution of search warrants, and the arrest of individuals wanted for various violations of federal law.

3.   As a SA, I have received instructions in the identification, collection, and preservation of evidence,

photography, latent print collection, and crime-scene investigations.  I have also completed hundreds of hours of criminal investigations, including compiling information; interviewing victims, witnesses, and suspects; and collecting evidence to support the filing of criminal complaints and search warrants.

4.   During the course of my investigations, I have interviewed witnesses, conducted physical surveillance, participated in the execution of arrest and search warrants, and reviewed various forms of evidence including telephone call detail records, bank records, invoices, photographs, recorded telephone calls and other miscellaneous financial documents. Through my training, education, and experience, I have become familiar with a variety of fraud schemes.

5.   In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior FBI agents with years of experience in various criminal investigations including, but not limited to, corporate and securities fraud, mail fraud, wire fraud, securities fraud, and insider trading. Throughout my experiences with these senior agents, I have received guidance, training, and hands-on experience in various investigative techniques including, but not limited to, interviewing, surveillance, financial analysis, and other investigative techniques, including with respect to the identification and tracing of illicit proceeds.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, documents

and records that were collected and reviewed in the course of this investigation, and information that was obtained from interviewed witnesses.

## II. <u>PURPOSE OF AFFIDAVIT</u>

7.    I make this affidavit in support for the issuance of a criminal complaint and arrest warrant against Maria Elvia Mares ("MARES") for a violation of Title 18, United States Code, Section 152(3) (False Statement in Bankruptcy).

8.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. <u>PROBABLE CAUSE</u>

### A.    **MARES's Background in the U.S. Bankruptcy Court**

9.    Based on my investigation to date and as more fully set forth below, on or about October 7, 2014, Abram S. Feuerstein, Assistant U.S. Trustee, on behalf of Peter C. Anderson, the United States Trustee for the Central District of California ("U.S. Trustee"), filed a motion before the Honorable Mark D. Houle, United States Bankruptcy Court Judge, Central District of California, for an order imposing fines of $1,000 against MARES and disgorging fees of $199 that MARES received

3

from debtors in Case No. 6:14-bk-21482-MH for preparing the
debtors' bankruptcy petitions.  The basis of this order was for
violating Bankruptcy Code Section 110 by collecting and/or
otherwise handling the court fees in connection with the filing
of the bankruptcy case, and by using the word "legal" to
describe her business association, "Riverside Legal Documents."

10.  On or about October 17, 2014, Jason K. Schrader, Trial
Attorney, on behalf of the U.S. Trustee, filed a motion before
the Honorable Scott C. Clarkson, United States Bankruptcy Judge,
Central District of California, for an order imposing fines of
$1,000 against MARES and disgorging $1,500 in compensation that
MARES received from the debtors in Case No. 6:14-bk-21482-MH,
for violating numerous provisions of Bankruptcy Code Section 110
by failing to disclose all of her compensation and by unlawfully
providing legal advice to the debtor.

11.  On or about January 5, 2015, the U.S. Trustee and
MARES fully executed a stipulation resolving the U.S. Trustee's
motions for disgorgement and fines against Mares. I reviewed the
stipulation, which is signed by "Maria Mares" and dated January
5, 2015. On January 6, 2015, the stipulation was approved by the
Honorable Mark D. Houle, United States Bankruptcy Judge. The
order reflects the following:

a.  MARES, as well as any of MARES's agents,
associates, employees, and/or assignees (collectively, the
"Enjoined Parties"), shall be permanently enjoined from further
acting as bankruptcy petition preparers and/or providing
bankruptcy related or debt relief services, whether directly or

indirectly, whether compensated or not (collectively, the "Enjoined Services"), within the Central District of California (the "Permanent Injunction").

   b.   The Permanent Injunction shall not apply to MARES to the extent that she is performing duties as an actual employee of an attorney and that attorney is actively supervising her work in an employee/employer relationship. To the extent that MARES is or should be employed by an attorney who will directly supervise her work, she must provide notice to the U.S. Trustee of the identity of her employer and the nature of her duties as an employee. Such notice shall be sent by mail to the U.S. Trustee within fourteen days of a change of employment.

   c.   Neither MARES nor the other Enjoined Parties will advertise that they offer, perform, or provide any of the Enjoined Services.

   d.   MARES shall disgorge $1,500 to the debtors and shall pay fines of $750 to the U.S. Trustee.[1]

**B.   After being permanently enjoined, MARES continued to act as a bankruptcy petition preparer ("BPP")**

12.   On or about July 30, 2019, U.S. Bankruptcy Court Judge Wayne Johnson, Central District of California, held a hearing regarding the filing fee waiver application of another debtor, M.N., in Case No. 6:19-bk-16555-SC. I have reviewed a transcript

---

[1]   As of January 2020, the U.S. Trustee had not received any notice from MARES regarding her employment with any attorney.

of this July 30, 2019, hearing. During the hearing, M.N. testified under oath that he paid $1,000 to MARES of the Law Offices of Anthony Contreras consisting of two cash payments of $500 each. M.N. testified that he met with MARES and paid the $1,000 for MARES and Mr. Contreras assisting him in preparing his bankruptcy petition with the completed bankruptcy forms. M.N. also testified that MARES told him that Mr. Contreras would review his paperwork.

13.   I also reviewed M.N.'s bankruptcy petition, which was filed on or about July 29, 2019. The bankruptcy petition, which M.N. indicated was either prepared by MARES or Mr. Contreras, does not disclose that M.N. paid an attorney, paralegal, or BPP to prepare his bankruptcy petition. Specifically, on Official Form 101, the "No" box was checked to the question, "Did you pay or agree to pay someone who is not an attorney to help you fill out your bankruptcy forms?" On Official Form 106Dec and Official Form 107, the box was checked "no" to the questions, "Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?" Based on my investigation, I believe these statements are false. Additionally, an Official Form 119: Bankruptcy Petition Preparer's Notice, Declaration, and Signature, which would typically be submitted when disclosing that a BPP prepared the petition, was not submitted with M.N.'s bankruptcy petition.

**C.    Background on the Law Offices of Anthony Contreras and MARES**

14.   On or about January 9, 2020, and again on January 10, 2020, I performed social media and public searches on the Law Office of Anthony Contreras and MARES.

15.   I located a website for the Law Office of Anthony Contreras.[2] Per the website, Anthony Contreras is a Criminal Defense Attorney serving the Inland Empire, Los Angeles County, and Orange County with over 25 years of experience. MARES is listed as the Director of Operations. Per the website, MARES "brings 20 years of experience in real estate serving the Inland Empire, Los Angeles County and Orange County. As a real estate investor and business owner, Maria has substantial experience in bankruptcy, criminal and real estate law." The business address listed on the website was 8175 Limonite Ave., Suite A5, Riverside, CA 92509.

16.   The Law Office of Anthony Contreras website contained photographs of MARES and Anthony Contreras. I compared these photographs to California DMV driver's license photographs I obtained of MARES and Anthony Contreras. The individuals pictured on the website's photographs appear to be MARES and Anthony Contreras.

17.   I also performed an Attorney Licensee Search on the State Bar of California website for Anthony Contreras.[3] According

---

[2]    https://abogadotonycontreras.com (last accessed January 10, 2019); it appears this website is no longer active.

[3]    https://apps.calbar.ca.gov/attorney/LicenseeSearch/QuickSearch?FreeText=van (last accessed on January 7, 2022)

to the State Bar of California website, Contreras was admitted
to the State Bar of California on September 28, 1994.
Disciplinary charges were filed on January 29, 2014, and
Contreras was placed on probation. On December 14, 2015,
Contreras's license was suspended for failing to pass the
Professional Responsibility Examination, and he was not eligible
to practice law in California. On December 18, 2015, Contreras'
license became active again. On June 20, 2017, disciplinary
charges were filed again, and on April 13, 2018, Contreras'
license was suspended, and he was not eligible to practice law
in California. On July 12, 2018, Contreras' license became
active again, but on November 30, 2018, disciplinary charges
were filed again in State Bar Court. Contreras' license was
suspended again on May 20, 2019, for failing to pass the
Professional Responsibility Examination. On August 16, 2019,
Contreras was disciplined with actual suspension. On June 2,
2021, Contreras' license was resigned, and currently, Contreras
is not eligible to practice law in California.

18.   I also conducted a Facebook search for the Law Office of Anthony Contreras. I located a Facebook post by Exclusiva Magazine,[4] which showed a Spanish language advertisement for the Law Office of Anthony Contreras. The advertisement contained a list of legal services provided by the law office, a photograph of Anthony Contreras and MARES, and offered a $200 discount.



*Advertisement Located on Exclusiva Magazine's Facebook Page*

19.   I also located a public Instagram profile,[5] with the username 7maresocean.  This profile contains photographs of MARES and includes the name MARIA MARES in the biographical section of the profile. I located Instagram posts in which legal services are advertised. An Instagram post on April 3, 2019, shows a photo of a woman's legs standing on the street, followed by a photo of MARES in front of a silver BMW. The caption under the photos is "Walk a straight line!!! DUI Specialist serving

---

[4]    https://www.facebook.com/page/194246267301478/ search/?q=anthony%20contreras (last accessed January 7, 2022)

[5]    https://instagram.com/7maresocean (last accessed January 7, 2022)

all courts Riverside ,Orange[sic] and Los Angeles county." An
Instagram post on April 4, 2019, shows a photo of a woman's foot
on top of the hood of a silver BMW. The caption under the photo
reads, "Specializing in Foreclosures bankruptcies & evictions.
Stop your creditors and keep your assets!!!" An Instagram post
on April 12, 2019, shows a photo of MARES inside a vehicle and
reads, "Drive Hands Free. No texting and driving. Traffic
violation specialist specialist[sic]. Felonies misdemeanors,
Federal court. Riverside ,Orange[sic] & Los Angeles courthouse.
Call the law office 1877523-5507." An Instagram post on April
13, 2019, shows a photo of a woman's lower body posing in front
of a mirror. The caption under the photo reads "More people
looking in the mirror for legal representation!!! Criminal
defense attorney's[sic]. Don't go to court alone. We are here
locally. 8175 Limonite Ave Riverside or 1875 E. First street
Santa Ana CA 1877 523-5507."

    **D.**   **The FBI interviews M.N. about his bankruptcy petition**

    20.   The U.S. Trustee, through Abram Feuerstein, referred
this matter to my office for investigation. Thereafter, on or
about January 6, 2020, FBI SA Colin Schmitt and I interviewed
M.N., who told us the following:

    a.   In 2013, M.N. had an accident at work in which he
injured his arm. M.N. was unable to work and incurred debt
because of being unemployed. M.N. was receiving phone calls from
collection agencies constantly and wanted to file bankruptcy in
order to have financial relief. M.N. tried searching for

attorneys who could help him file bankruptcy, but the attorneys M.N. contacted charged rates that M.N. could not afford to pay.

b.   One day, M.N. found a classified ads magazine outside of his local grocery store. Inside the magazine, M.N. found an advertisement for The Law Office of Anthony Contreras. The advertisement offered various legal services, such as assistance with bankruptcies. The advertisement also contained a $200 coupon for legal services. M.N. was interested in calling The Law Office of Anthony Contreras because of the $200 coupon offered in the advertisement.[6]

c.   When M.N. called The Law Office of Anthony Contreras, a woman, who identified herself as an assistant, answered the telephone. M.N. asked the woman how much it would cost to have Anthony Contreras handle his bankruptcy. The woman told M.N. it would cost approximately $2,500. M.N. did not have the money, so M.N. told the woman he was not able to pay for the services.

d.   Minutes later, M.N. received a telephone call from a woman who identified herself as "Maria Mares." MARES told M.N. she could help him with his bankruptcy petition for a total of $1,000. M.N. told MARES he would need a couple of days to get the money together because he did not have the money. M.N. then borrowed $500 in cash from his brother to pay MARES.

---

[6]   I showed M.N. the Exclusiva Magazine advertisement for The Law Office of Anthony Contreras I located on Facebook. M.N. initialed and dated the advertisement confirming the advertisement was very similar to the one M.N. found in the classified ads magazine.

e.   MARES arranged to meet with M.N. MARES told M.N. to bring his income taxes from 2017-2018 and any documentation of M.N.'s debts to their first meeting. M.N. met with MARES at her office, located at 8175 Limonite Avenue, Suite A5, Riverside, CA 92509. When M.N. arrived, he was unsure if he was actually at a law office. There was no sign that read "Law Offices of Anthony Contreras" and the office looked bare. In the office, there were only one desk and some chairs. M.N. did not see any computers or telephones. Additionally, the woman who identified herself as MARES was dressed in shorts and wore sandals.

f.   M.N. did not speak to or meet with Anthony Contreras. M.N. asked MARES if he was at the Law Offices of Anthony Contreras, and MARES showed him a business card with her name on it. The business card read, "The Law Offices of Anthony Contreras." Another female was present at the meeting, who identified herself as MARES's assistant. M.N. could not recall the assistant's name. At the initial meeting, M.N. paid MARES a $500 deposit and gave MARES the documents she requested. MARES and her assistant prepared a contract for M.N., which M.N. signed.[7]

g.   After his initial meeting with MARES, M.N. tried to get in touch with MARES via telephone but did not get an answer. M.N. finally received an answer from MARES's assistant,

---

[7]   I showed M.N. a copy of the contract M.N. signed with the Law Offices of Anthony Contreras. M.N. acknowledged, dated, and initialed his signature. I also showed M.N. a DMV photograph of MARIA MARES, which did not contain identifying information. M.N. positively identified the woman in the photo as MARES.

who told M.N. that MARES was on vacation and would not return for another two weeks. M.N. continued to have trouble reaching MARES via telephone.

      h.  M.N. had become depressed due to his physical injury and unemployment. M.N. was stressed and frustrated that he could not reach MARES via telephone. At that time, M.N. was seeing a psychologist to treat his depression, and M.N. told the psychologist that he had paid MARES to help him with his bankruptcy and that M.N. was now having trouble getting in touch with MARES. The psychologist asked M.N. to provide MARES's telephone number. The psychologist called and left a voicemail for MARES asking MARES to call M.N. right away. The psychologist told MARES that if MARES did not call M.N. back, the psychologist would file a police report. Later that day, MARES called M.N. and asked him why he was telling people about her. MARES and M.N. arranged a second meeting.

      i.  At the second meeting, MARES met with M.N. at the same office in Riverside. Also present during the meeting was MARES's assistant. MARES told M.N. she would not begin preparing the paperwork until M.N. paid the remaining $500. M.N. borrowed an additional $500 from his brother and paid MARES that day so that MARES could begin M.N.'s bankruptcy paperwork. MARES told M.N. that he would need to come back to the office when the paralegal was present. MARES told M.N. that an appointment needed to be set for a Saturday because traffic was bad on weekdays and the paralegal lived in Los Angeles.

j.   At the third meeting, M.N. went to MARES's office in Riverside and met with MARES and MARES's paralegal. MARES and the paralegal asked M.N. questions about his bankruptcy petition. MARES also told M.N. that the Court charged a filing fee and that the filing fee would be waived because M.N. was unemployed. At that meeting, M.N. still did not receive any bankruptcy documents from MARES or MARES's paralegal. MARES told M.N. that Anthony Contreras would look over the paperwork before she gave it back to M.N.[8]

k.   Days later, MARES sent M.N. a text message in Spanish[9] arranging a fourth meeting. At that meeting, MARES had M.N.'s bankruptcy petition ready and told M.N. where to sign. MARES made copies of some documents and instructed M.N. to file the paperwork at the Court.

l.   On or around Monday, July 29, 2019, M.N. went to the U.S. Bankruptcy Court in Riverside to file the bankruptcy paperwork. A few days before, M.N. talked to MARES on the phone, and MARES told M.N. that if anybody at the Court asked him if somebody helped M.N. prepare the bankruptcy documents, tell them that nobody helped him. M.N. asked MARES if she wanted him to lie to the Court. MARES said, "Yes, because the bankruptcy won't go through." M.N. did not want to lie to the Court.

---

[8]   I showed M.N. a redacted DMV photograph of Anthony Contreras. M.N. did not identify Contreras.

[9]   M.N. received the text messages from MARES, telephone number 310-944-0669. Based on my own telephone calls with MARES at this telephone number, I believe MARES to be the user of this telephone number. M.N. voluntarily showed me text messages between him and MARES. M.N. consented to me taking photographs of the text messages and MARES's contact information.

m.   When M.N. went to the U.S. Bankruptcy Court, someone at the Court told M.N. that his paperwork was filled out wrong and that his fee would not be waived. M.N. also told the Court that MARES had helped him prepare his bankruptcy documents. When M.N. went to pay the $335 filing fee that same day, M.N. saw MARES and her assistant at the Court. MARES and her assistant were with a male who appeared to be one of their customers. M.N. believed they were helping the male file a bankruptcy petition. M.N. was angry and told MARES that the filing fee had not been waived and that the Court had told him the paperwork "was no good." MARES did not seem to care. In total, M.N. paid $1,335 to file his bankruptcy petition.

n.   M.N. told me that he did not prepare any part of his bankruptcy petition and MARES filled out M.N.'s bankruptcy paperwork. On the bankruptcy petition, with respect to questions asking if M.N. had paid or agreed to pay anyone to fill out his bankruptcy forms, M.N. stated that it was MARES who checked the "No" box.

21.  I believe MARES instructed M.N. to tell the Court that nobody helped him with his bankruptcy petition because MARES prepared the petition, MARES was aware that she was permanently enjoined from acting as a BPP because of the order dated January 6, 2015, and MARES willfully lied and caused M.N to lie on the petition when she answered the questions on the petition discussed above. M.N.'s disclosure to the Court that MARES assisted him with his petition in 2019 would not only result in

further legal consequences for MARES, but could also result in M.N.'s bankruptcy petition "not go[ing] through."

**E.    The FBI interviews Anthony Contreras, who stated he did not assist M.N. with a bankruptcy petition**

22.    On or about December 31, 2021, FBI SA Stephen Harrison and I interviewed Anthony Contreras who told us the following:

a.    Contreras was an attorney for approximately 25 years. Approximately two years ago, Contreras lost his California bar license. Contreras failed to take an exam because he did not have the money to pay for the exam. When Contreras was a practicing attorney, Contreras practiced criminal, family, and bankruptcy law.

b.    Contreras met MARES through another attorney, Thomas Gillen, whom Contreras met at a court in Riverside. MARES worked for Gillen. Approximately two years ago, MARES approached Contreras and asked if Contreras was interested in setting up a law practice. MARES offered to help Contreras set up the practice and work with Contreras at the new practice. Contreras accepted MARES's help because he had approximately six clients at the time and running a practice required a lot of work.

c.    Months later, MARES had Contreras sign lease documents for an office on Limonite Avenue in Riverside. MARES was the one who found the office. The practice was called The Law Office of Anthony Contreras. Contreras did not go to the office daily, but instead showed up if he needed to meet with a client.

16

d.    MARES was an Office Manager. She oversaw the office, bringing in clients and doing the advertising for The Law Office of Anthony Contreras. MARES did not assist Contreras with any legal work. There were only three people who worked at the office: Contreras, MARES, and another female whose name Contreras could not remember.

e.    Contreras and MARES discussed MARES's pay, which would be based on grade and depended on the type of case that was brought in. Because Contreras suddenly lost his license only months after The Law Office of Anthony Contreras was established, Contreras never paid MARES.

f.    MARES did not bring Contreras any clients that resulted in actual work. Contreras believed there were two or three potential clients that ultimately did not become clients. Contreras met with a bankruptcy petitioner, M.S., one time. M.S. retained Contreras for approximately $1,500, but no work was performed for M.S. MARES was supposed to return the $1,500 to M.S. since no work was done, but MARES did not return the money. Later, M.S. complained about Contreras not returning M.S.'s money, and Contreras believed this was the reason he was ultimately disbarred. Contreras could not recall if M.S. paid Contreras or MARES directly.

g.    Contreras told me he did not set up the website for The Law Office of Anthony Contreras but recalled taking the picture that was posted on the website. Contreras believed MARES set up the website.

17

h.    Contreras told me he never visited or practiced at the location at 1851 E. First Street, Suite 900, Santa Ana, CA 92705. Contreras had not been aware that he had an office there.

i.    Contreras told me he has always disclosed his identity when he has assisted bankruptcy petitioners in preparing bankruptcy petitions.

j.    Contreras told me that MARES did not tell him that she had been enjoined from preparing bankruptcy petitions. Contreras never asked MARES to assist with preparing any bankruptcy petitions.

k.    I showed Contreras a redacted DMV photo of M.N. Contreras did not recognize the man in the photo. I also showed Contreras a receipt from The Law Office of Anthony Contreras for work done for M.N., as well as M.N.'s bankruptcy petition. Contreras did not recognize or know M.N. To Contreras's knowledge, M.N. has never been Contreras's client. Contreras told me he did not assist M.N. with his bankruptcy or prepare M.N.'s bankruptcy petition.

l.    I showed Contreras a redacted DMV photo of MARES. Contreras positively identified MARES.

23.  Based on Contreras's and M.N.'s statements, I believe that Contreras did not meet with M.N. and that Contreras did not prepare M.N.'s bankruptcy petition.

**F.    Interview of MARES**

24.   On or about October 16, 2020, FBI SA Schmitt and I interviewed MARES in person in her home, who told us the following:

a.    MARES worked with an attorney, Thomas Gillen, as an Office Manager from approximately 2010 to 2016 in Riverside. After Gillen retired, MARES freelanced for different attorneys doing paralegal work, including Anthony Contreras from approximately 2018 to 2019 at a law office off Limonite in Riverside. MARES met Contreras through Gillen. The law office was only open for about eight months because Contreras lost his license. Contreras did a lot of criminal work. There were some bankruptcy cases also, and Contreras would oversee the bankruptcy cases. Contreras would charge clients about $1,200 for Chapter 7 bankruptcies and over $2,000 for Chapter 13 bankruptcies.

b.    MARES told me she knows the basics of bankruptcy but did not get into the preparation of bankruptcy petitions. MARES was more on the managing side. MARES also told me she spent most of her eight-month employment with Contreras setting up the law firm, getting the website running, getting the forms, and getting the office furnished. MARES told me she has never been a paralegal.

c.    MARES explained to me the process of clients coming into the law firm for bankruptcies. The client would call the office and make an appointment. The client would always meet the attorney. The client would contract the attorney, sign the

19

receipt, and the firm would take in the funds. A paralegal would then be called to fill out the petition. The paralegal would sit with the client and fill out the petition. Nothing was filed unless the attorney reviewed it and met with the client again. Once the document was completed, the client was called back to sign the documents. The documents were filed at the Court by a filer or "runner," and sometimes the attorney would send the petition electronically to the Court. The client would pay the filing fee. Afterwards, there was a 341 meeting.[10] MARES did not attend any of the hearings.

      d.    I asked MARES if she recalled receiving anything from the Bankruptcy Court for a bankruptcy filed in 2014/2015 for petitioners J.S. and N.S.[11] MARES acknowledged receiving something from the Bankruptcy Court. MARES recalled that they were Gillen's clients. Normally, the petitions would be filed electronically, but in this instance, MARES "walked" the petition in. Someone called MARES and told her she would need to pay a fine. MARES has not paid the fine, and the fine is still pending. MARES denied filling out the bankruptcy petition for these debtors.

      e.    At this point during the interview, I showed MARES the bankruptcy petition for Case No. 6:14-bk-21482-MH,

---

    [10] A 341(a) meeting is required by Bankruptcy Code section 341(a), and is a meeting that is held after a bankruptcy case is filed, so that creditors and the trustee can ask questions about the debtor's financial situation. The meeting is presided over by either the trustee assigned to the case and/or a representative of the U.S. Trustee's Office.

    [11]    J.S. and N.S. are the debtors in Case No. 6:14-bk-21482-MH.

filed on September 12, 2014. I pointed to the section in the petition titled "Signature of Non-Attorney Bankruptcy Petition Preparer," which bore MARES's name, signature, and Social Security Number. MARES verbally acknowledged her Social Security Number and signature. MARES remembered signing the bankruptcy petition for the debtors because it was an emergency. MARES told me they did see an attorney, but did not have funds, so MARES took it in. Because MARES took the petition in and paid for the fee, she got in trouble. MARES agreed to pay the fine but has not paid it.

f.    I also showed MARES the Stipulation Resolving Motions for Disgorgement and Fines Against MARES Pursuant to 11 U.S.C. § 110, Case No 6:14-bk-21482-MH. I read portions of page 3 of the Stipulation to MARES. I then showed MARES page 5 of the Stipulation, which contained MARES's signature, dated January 5, 2015. MARES verbally acknowledged her signature on the Stipulation document.

g.    MARES told me that she did not want to be involved in bankruptcy filings after she got in trouble. MARES did not do bankruptcies anymore until recently with Contreras because it was too much stress for her.

h.    I showed MARES a redacted DMV photograph of M.N., and asked MARES if she remembered the man in the photo. MARES remembered M.N. M.N. went into Contreras's office to file a petition because he wanted to file bankruptcy. M.N. contracted the attorney.

i.    I showed MARES a document from the Law Offices of
Anthony Contreras, which appeared to be a contract between the
law office and M.N. I asked MARES if she recognized the
paperwork. MARES told me the document was more like a receipt.
MARES told me the signature at the bottom of the document was
the signature of a legal assistant that was working for
Contreras. MARES could not remember the name of the legal
assistant.

j.    I also showed MARES a bankruptcy petition, filed
on July 29, 2019, for M.N. I showed MARES page 8 and the
Official Form 106D, which asks "Did you pay or agree to pay
someone who is not an attorney to help you fill out your
bankruptcy form?" The box is checked "no." MARES acknowledged
working at The Law Office of Anthony Contreras around July 2019
but denied involvement in filing the petition. MARES denied
helping M.N.

### G.    Months after her interview with the FBI, MARES contacts Contreras asking for help and Contreras conducts a consensually monitored phone call with MARES

25.   On or about January 14, 2021, I spoke with Contreras.
Contreras told me that he received a text message that day from
MARES[12] saying she needed help.

26.   On January 20, 2021, FBI SA Harrison and I met with
Anthony Contreras at the FBI Riverside Resident Agency.

---

[12]    The telephone number MARES used to text Contreras was
310-944-0669.

Contreras told us that MARES asked to speak with him on the telephone to discuss some issues regarding a bankruptcy client.[13]

27.  At this time, Contreras placed a consensually monitored telephone call to MARES. SA Harrison and I were present in the room with Contreras during the telephone call.

a.  During the telephone conversation, MARES told Contreras that one of their clients went to the Bankruptcy Court and said all kinds of things about MARES to the Trustee, so the Trustee now thinks MARES took the client's money and prepared the documents.

b.  MARES told Contreras that there is a hearing and MARES hired an attorney. The attorney wants some type of declaration just to clarify that MARES was not the one preparing anything and that they just closed the office and told the client to go file the paperwork. The client had a choice to get his money back or go file the paperwork and the client chose to file it.

c.  MARES told Contreras there was some type of discrepancy when he filed, and the client started saying things about MARES. The client pulled out a card with her name on it. MARES thinks the client said he gave MARES $1,000, and that it was MARES who consulted him, filed everything, and prepared everything. MARES told Contreras that "they" are saying that MARES was acting as an attorney to do that. MARES did not do that. There was an attorney there, but they happened to close

---

[13]     Contreras voluntarily showed me the text messages between him and MARES and allowed me to take photographs of these text messages.

the office down. Now, they have to prepare a declaration stating what happened to clear MARES.

      d.   MARES told Contreras that the client is M. "Nimo."[14] Contreras asked MARES if he met with "Nimo." MARES says she thinks Contreras just talked to "Nimo" on the phone just like with M.S.

      e.   MARES told Contreras that a lady is helping MARES draft the declaration. MARES told Contreras the lady can draft the declaration and they can send it to Contreras and Contreras can sign it and send it back.

      f.   Contreras told MARES he did not remember "Nimo" as a client, but he will look at the declaration. MARES says "Nimo" met with the paralegal, not with MARES. MARES did not prepare his paperwork. "Nimo" met with the paralegal and brought all the documentation, and that day, MARES believes they called Contreras on the phone and Contreras said they would review the paperwork. MARES was not too sure if the paperwork was done when Contreras talked to "Nimo" or if they talked before the paperwork was done, but according to MARES, Contreras said they would prepare the paperwork. They finished the paperwork for "Nimo," but they could not add Contreras's name on it.

      g.   When Contreras asked MARES what paralegal "Nimo" met with, MARES told him she has the name of the paralegal, and that the paralegal was the only one preparing the documents at the time. MARES did not provide a name but told Contreras she

---

    [14] I believe MARES was referring to M.N.

can get the paralegal's name. MARES told Contreras she did not prepare any documents or any bankruptcies.

      h.   Contreras asked if MARES is talking about returning money to "Nimo." Contreras says he does not have money, he is not a lawyer, and he is not practicing law. MARES says that if it comes down to it, MARES will give Contreras the $1,000 to give back to "Nimo." MARES just did not want this to be on her hands because she did not have a law degree to be preparing bankruptcy petitions or consulting anybody. MARES told Contreras that when they clean it all up and say they just could not get ahold of the client to give him back his money, MARES will give Contreras the money if "they" request it.

      i.   Contreras told MARES that his name was not on the petition and asks why he would have to return the money. MARES says his name was not on it because they closed the office. The reason they did not put his name on it was because it was when Contreras lost his license.

    28.  On or about February 1, 2021, I spoke with Contreras again. Contreras told me he received the declaration from MARES. According to Contreras, the declaration stated that Contreras assisted M.N. from February 2019 to July 2019. Contreras told me he closed his office in March 2019, and he had no recollection of M.N. Contreras stated that he would not have had any clients during the dates MARES

referenced on the declaration and that he did not feel comfortable signing the declaration.[15]

29.   On or about March 8, 2021, I spoke with Contreras again, who told me that he did not employ a paralegal or a legal assistant at The Law Office of Anthony Contreras. Contreras, however, did remember that there was a Hispanic female who worked as a secretary part-time. Contreras could not remember the secretary's name. Contreras stated that the secretary was brought in by MARES, not by him.

## IV. CONCLUSION

30.   For all the reasons described above, there is probable cause to believe that MARES has committed a violation of Title 18, United States Code, Section 152(3) (False Statement in Bankruptcy).

Attested to by the applicant, FBI SA Jazmin Vidana, in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 11th day of January , 2022.

_____
UNITED STATES MAGISTRATE JUDGE

---

[15]   On about March 8, 2021, Contreras sent me the draft declaration he received from MARES. I reviewed the declaration. It appears that a final declaration was filed on February 8, 2021, at the U.S. Bankruptcy Court, Central District of California, under Case No. 2:2018-bk-19541-WB, which was MARES's own bankruptcy matter. The final declaration is signed by MARES and is not signed by Contreras.